**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**JOHN MICHAEL WARREN,**
**1144 Springwater Drive**
**Mandeville, LA 70471**
**DEBORAH COTE,**
**17108 Vardon Terrace**
**Bradenton, FL 34211**
**ANDREW BUNENKO,**
**1331 Seabridge Lane**
**Oxnard, CA 93035**
**MOHAMED YOUSSEF AMIN BRIHMAT,**
**27 Golden Ave. Apt. F02**
**Deer Park, NY 11729**
**on behalf of themselves and all**
**others similarly situated,**

           **Case No.: 1:26-CV-00556-MJS**

        **Plaintiffs,**

**v.**

**DANAHER CORPORATION,**
**2200 Pennsylvania Avenue NW, Suite 800W**
**Washington DC 20037**
**BECKMAN COULTER, INC.,**
**250 S Kraemer Blvd**
**Brea, CA 92821**
**INTEGRATED DNA TECHNOLOGIES, INC.,**
**1710 Commercial Park**
**Coralville, IA 52241**
**PALL CORPORATION,**
**25 Harbor Park Drive**
**Port Washington, NY 11050**
**CYTIVA,**
**100 Results Way**
**Marlborough, MA 01752**
**ABCAM**
**152 Grove Street, Suite 1100**
**Waltham, MA 02453**

        **Defendants.**

_____/

<u>**AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**</u>

Plaintiffs John Michael Warren, Deborah Cote, Andrew Bunenko and Mohamed Youssef Amin Brihmat ("Plaintiffs" or, individually, "Warren", "Cote", "Bunenko", or "Brihmat"), for themselves and on behalf of all others similarly situated, allege, upon personal knowledge as to themselves and their own applications, qualifications, communications, and rejections, and upon information and belief as to matters within Defendants' possession, custody, or control, as follows:

## INTRODUCTION

1.      This is a class and collective action brought by representatives who applied for employment with Defendants Danaher Corporation ("Danaher") and Danaher's OpCos' including Beckman Coulter, Inc., Integrated DNA Technologies, Inc., Pall Corporation, Cytiva, and Abcam, each of which participated in the challenged recruiting, screening, and hiring process, alleging violations of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621, *et seq.* ("ADEA"), the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq.* ("FCRA"), New York State Human Rights Law, Article 15 §§ 290-301 ("NYSHRL"), California Fair Employment and Housing Act, Gov. Code § 12940 *et seq.* ("FEHA") and the Louisiana Employment Discrimination Law, LA Rev Stat § 23:312 ("LEDL"). Plaintiffs are seeking damages including back pay, front pay, liquidated damages, punitive damages, lost benefits, compensatory damages, emotional distress, pain and suffering, injunctive relief, reasonable attorneys' fees and costs and any other relief to which Plaintiffs are entitled, including, but not limited to, equitable relief.

2.      Danaher is an American Fortune 200 company. It operates globally, primarily in the life sciences, diagnostics and biotechnology sectors. Danaher, a conglomerate, is comprised of more than two dozen wholly owned subsidiaries and operating companies (also referred to as "OpCos"). For purposes of this Complaint, Defendant Danaher and its co-Defendants are referred to collectively as "Defendants," unless otherwise specified.

3.      Collectively, Danaher and its subsidiaries employ over 25,000 employees in the United States.

4.      Defendant Danaher is not merely a passive holding company with respect to the hiring practices challenged in this action. Danaher exercised centralized authority over, administered, monitored, and required the use of recruiting infrastructure through which applicants for positions at Danaher and its operating companies were sourced, screened, ranked, advanced, rejected, or selected for interview.

5.      Danaher's role included setting recruiting-system requirements, maintaining enterprise applicant data, governing Talent Acquisition processes, and requiring OpCos to process Covered Position[1] applicants through common Danaher-controlled or Danaher-integrated systems.

6.      Danaher and its operating companies, including Beckman Coulter, Integrated DNA Technologies, Pall, Cytiva, and Abcam, used common or integrated recruiting systems, including Danaher-branded careers postings, Workday applicant-tracking workflows, Danaher Talent Acquisition screening, artificial-intelligence-assisted recruiting tools, and Danaher Business System governance to process applications for sales, account-management, business-development, sales-leadership, and strategic-account positions.

7.      Applicants for these positions were required to submit materials through Defendants' common recruiting infrastructure before any hiring manager could consider them for interview or hire.

8.      Plaintiffs and similarly situated applicants age forty and older were required to proceed through these common recruiting and screening systems before they could be selected

---

[1] A "Covered Position" is any position at Danaher or its OpCos that is subject to the Workday/Talent Acquisition workflow before a first interview.

3

for interviews. Applicants rejected at the screening stage were denied employment opportunities before they could meaningfully compete for the positions for which they applied.

9.      Plaintiffs applied for various sales and account management positions (all within "Covered Positions") across the country with Danaher and its OpCos. Their applications for employment were rejected, and they were never hired despite being as qualified or more qualified than younger applicants who were hired.

10.      Plaintiffs were qualified, and in many instances exceptionally qualified, for the Covered Positions based on their decades of relevant sales, account-management, business-development, leadership, life-sciences, diagnostics, healthcare, and technical-industry experience. Nevertheless, Defendants rejected Plaintiffs' applications, often at the initial screening stage and without affording them an interview, while advancing and hiring substantially younger applicants who were not more qualified than Plaintiffs.

11.      Defendants' screening practices treated age-correlated information — including decades of work history, seniority, graduation dates, lengthy experience, and extensive career progression — as negative screening factors rather than as evidence of qualification. Defendants used that information as a proxy for age when screening applicants for Covered Positions.

12.      Defendants' challenged practices were intentional. Defendants designed, implemented, maintained, and used recruiting and screening systems that collected age-correlated applicant information and used that information to disfavor applicants age forty and older for Covered Positions.

13.      As a result of Defendants' discriminatory recruiting and hiring practices, Plaintiffs and similarly situated applicants age forty and older were denied interviews, employment opportunities, wages, benefits, and other compensation for which they were qualified.

**JURISDICTION AND VENUE**

14.     This Court has original subject matter jurisdiction over the ADEA claims pursuant to 28 U.S.C. § 1331 and Section 7(c) of the ADEA, 29 U.S.C. § 626(c).

15.     This Court has supplemental jurisdiction over the FCRA, NYSHRL, FEHA and LEDL claims under 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

16.     This Court has general personal jurisdiction over Defendant Danaher because Danaher's principal place of business, corporate headquarters, nerve center, and center of corporate direction and control are located in the District of Columbia. Additionally, Danaher's senior corporate leadership, enterprise governance, and centralized employment-governance functions operate from this District. Danaher is therefore at home in this District and may be sued here on claims arising from its companywide policies and employment practices.

17.     This Court has specific personal jurisdiction over Defendants Beckman Coulter, Integrated DNA Technologies, Pall, Cytiva, and Abcam because Plaintiffs' claims arise from and are directly connected to those Defendants' purposeful participation in Danaher's centralized recruiting, hiring, applicant-screening, Talent Acquisition, Workday-based, AI-assisted, and employment-governance systems, including the Danaher Business System ("DBS").

18.     Each OpCo Defendant used the Danaher-controlled recruiting infrastructure to solicit applications nationwide, receive applications for Covered Positions, process applicant data, screen candidates, create interview slates, issue rejection notices, and report recruiting and hiring information to Danaher.

19.     Each OpCo Defendant purposefully directed hiring-related activity to Danaher's

District of Columbia headquarters by participating in enterprise recruiting governance, submitting or maintaining applicant and hiring data within Danaher-controlled systems, accepting Danaher Talent Acquisition and DBS requirements, and implementing recruiting directives issued or monitored by Danaher from the District of Columbia.

20. Specifically, the Workday and AI-assisted screening rules, criteria, and candidate-advancement logic applied to applicants for Covered Positions were configured, administered, and controlled from Danaher's District of Columbia headquarters.

21. Due to the challenged screening operating as an automated and centrally governed system, the dispositive pre-interview screening decisions applied to Plaintiffs, including the configuration of the rules that rejected them before interview, emanated from and were issued through Danaher-controlled, D.C.-administered systems and personnel rather than from independent local decision making at each OpCo. Each OpCo Defendant participated in and accepted the benefits of Danaher's centralized recruiting infrastructure, including Danaher's common careers platform, Workday-based applicant-tracking workflows, Danaher Talent Acquisition processes, DBS-driven employment governance, reporting obligations, and hiring-related directives issued, administered, monitored, or enforced from Danaher's headquarters in the District of Columbia.

22. Thus, Defendants Beckman Coulter, Integrated DNA Technologies, Pall, Cytiva, and Abcam each transacted business in the District of Columbia within the meaning of D.C. Code § 13-423(a)(1) by participating in, accepting the benefits of, implementing, and complying with Danaher's centralized recruiting infrastructure, hiring policies, interview-slate requirements, reporting obligations, and employment-governance directives that were issued, administered, monitored, and enforced from Danaher's District of Columbia headquarters.

23.    Their contacts with the District were not incidental; they were the mechanism through which the challenged hiring practices were administered and applied to Plaintiffs and similarly situated applicants.

24.    Plaintiffs' claims arise directly from those District-connected contacts because the challenged hiring decisions resulted from the same centralized policies and practices that Danaher directed from the District of Columbia and that the OpCo Defendants implemented.

25.    Exercising jurisdiction over Beckman Coulter, Integrated DNA Technologies, Pall, Cytiva, and Abcam is consistent with due process because each purposefully participated in the District-directed system giving rise to Plaintiffs' claims and could reasonably anticipate being sued in this District for injuries caused by that system.

26.    Thus, this Court has personal jurisdiction over Defendants Danaher, Beckman Coulter, Integrated DNA, Pall, Cytiva, and Abcam.

27.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Danaher is subject to this Court's personal jurisdiction with respect to this civil action.

<u>**ADMINISTRATIVE PREREQUISITES**</u>

28.    Plaintiff Warren has exhausted his administrative remedies and complied with all statutory prerequisites for his ADEA and LEDL claims. On or about October 28, 2025, Warren dual-filed a class charge of age discrimination under the ADEA and LEDL with the Equal Employment Opportunity Commission ("EEOC") and the Louisiana Commission on Human Rights ("LCHR") on behalf of himself and all other similarly-situated applicants over the age of 40 alleging systemic age discrimination in Danaher's hiring practices. Pursuant to the EEOC's work-sharing agreement with the LCHR, Warren's charge is considered dually filed with the

LCHR. Warren has received his Notice of Right to Sue. This action is brought within ninety (90) days of his receipt of that Notice of Right to Sue.

29.     Plaintiff Cote has exhausted her administrative remedies and complied with all statutory prerequisites for her ADEA and FCRA claims. On or about December 19, 2025, Cote dual-filed a class charge of age discrimination under the ADEA and FCRA with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR") on behalf of herself and all other similarly-situated applicants over the age of 40 alleging systemic age discrimination in Danaher's hiring practices. Plaintiff Cote received her Notice of Right to Sue, and this action is brought within ninety (90) days of her receipt of that Notice of Right to Sue.

30.     In addition, Plaintiff Cote satisfied the FCRA's administrative exhaustion requirements because her charge was timely filed with or transmitted to the FCHR, the FCHR had notice and an opportunity to investigate, and all statutory conditions precedent to suit under the FCRA have been satisfied or otherwise occurred. To the extent required, more than 180 days elapsed without final agency action by the FCHR, or the FCHR otherwise authorized suit, before Plaintiff Cote pursued her FCRA claim.

31.     Plaintiff Bunenko has exhausted his administrative remedies and complied with all statutory prerequisites for his ADEA and FEHA claims. On or about November 3, 2025, Bunenko dual-filed a class charge of age discrimination under the ADEA and FEHA with the Equal Employment Opportunity Commission ("EEOC") and the California Civil Rights Department ("CCRD") on behalf of himself and all other similarly-situated applicants over the age of 40 alleging systemic age discrimination in Danaher's hiring practices. Pursuant to the EEOC's work-sharing agreement with the CCRD, Bunenko's charge is considered dually filed with the CCRD.

Bunenko has received his Notice of Right to Sue. This action is brought within ninety (90) days of his receipt of that Notice of Right to Sue.

32.　　On or about June 11, 2026, Bunenko received a Right-to-Sue Notice from the California Civil Rights Department. This action is timely, and all conditions precedent to Bunenko's FEHA claim have been satisfied.

33.　　Plaintiff Brihmat has exhausted his administrative remedies and complied with all statutory prerequisites for his ADEA and NYSHRL claims. On or about December 1, 2025, Brihmat dual-filed a class charge of age discrimination under the ADEA and NYSHRL with the Equal Employment Opportunity Commission ("EEOC") and New York State Division of Human Rights ("NYSDHR") on behalf of himself and all other similarly-situated applicants over the age of 40 alleging systemic age discrimination in Danaher's hiring practices. Pursuant to the EEOC's work-sharing agreement with the NYSDHR, Brihmat's charge is considered dually filed with the NYSDHR. Brihmat has received his Notice of Right to Sue. This action is brought within ninety (90) days of his receipt of that Notice of Right to Sue.

34.　　Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

35.　　Plaintiff John Michael Warren is currently fifty-nine (59) years old and a resident of Louisiana.

36.　　Plaintiff Deborah Cote is currently sixty-one (61) years old and a Florida resident.

37.　　Plaintiff Andrew Bunenko is currently sixty-six (66) years old and a California resident.

38.　　Plaintiff Mohamed Youssef Amin Brihmat is currently sixty (60) years old and a New York resident.

39.    Defendant Danaher is an American Fortune 200 company. Its principal place of business is located at 2200 Pennsylvania Avenue, NW, Suite 800W, Washington, D.C. 20037.

40.    Danaher operates through a network of operating companies, including Defendants Beckman Coulter, Integrated DNA Technologies, Pall Corporation, Cytiva, and Abcam, which are located throughout the United States and conduct business nationwide with direction, oversight, and employment-governance controls coming from Danaher's headquarters in Washington, D.C.

41.    Defendant Beckman Coulter is headquartered in Brea, California, and provides precision instruments to laboratories. Beckman Coulter employs several thousand people and operates nationwide.

42.    Defendant Integrated DNA is headquartered in Coralville, Iowa, operates nationally, and is in the DNA and RNA synthesis business. Integrated DNA employs several thousand people.

43.    Defendant Pall is headquartered in Port Washington, New York, provides high-tech filtration, separation and purification services. Pall employs several thousand people.

44.    Defendant Cytiva is headquartered in Marlborough, Massachusetts and develops technologies and services to advance science. Cytiva employs over 10,000 people.

45.    Defendant Abcam is headquartered in Waltham, Massachusetts and provides biological tools and data to the research community. Abcam employs over 1,800 people.

46.    Danaher exercised centralized control over the employment-related policies and practices of its operating companies, as they relate to the challenged recruiting and hiring process, including policies and practices concerning recruiting, applicant screening, hiring, talent acquisition, human resources, and workforce management.

47.    Danaher imposed, administered, monitored, and enforced those policies and

10

practices through centralized corporate governance, shared recruiting infrastructure, Workday applicant-tracking workflows, Danaher Talent Acquisition, artificial-intelligence-assisted recruiting tools, and the Danaher Business System ("DBS").[2]

48.     Danaher uses DBS as the operating architecture through which it translates corporate hiring objectives into mandatory OpCo-level practices, including requiring common recruiting, applicant-tracking, screening, reporting, and candidate-advancement practices for Covered Positions.

49.     Additionally, Danaher and its OpCos have an interrelation of operations as all of them come together to form the Danaher brand. Danaher and its OpCos use a common or integrated careers website through which applicants apply for positions at Danaher operating companies.[3]

50.     In their 2024 Proxy Statement, Danaher publicly acknowledged that DBS and related corporate oversight were used to strengthen and control its human-resources and talent-acquisition functions, including by "further strengthening the human resources organization and operations," promoting "DBS excellence in the human resources function," and overseeing "the talent acquisition organization and processes."

51.     DBS is not merely a set of aspirational corporate values, but a mechanism through which Danaher implements, monitors, and enforces companywide operational, recruiting, talent-acquisition, human-resources, and hiring requirements across its OpCos.

52.     Danaher and its OpCos further demonstrate common control and integrated operations through shared corporate leadership, coordinated shareholder and governance communications, common reporting structures, centralized oversight of employment-related policies and practices, and DBS-driven performance requirements.

---

[2] https://www.danaher.com/how-we-work/danaher-business-system
[3] https://jobs.danaher.com/global/en/search-results?keywords=&from=10&s=1

53.     Danaher and the OpCo Defendants constituted an integrated enterprise with respect to the challenged hiring practices because they shared interrelated recruiting operations, common management and oversight of talent-acquisition functions, centralized control over applicant-screening and labor-relations practices, and common ownership and financial control.

54.     The most important factor, centralized control over the challenged employment practice, is satisfied because Danaher controlled or materially influenced the systems, workflows, criteria, and data used to screen applicants and determine which applicants advanced to interviews.

55.     Danaher also acted as a joint employer with the OpCo Defendants because Danaher retained and exercised significant control over applicant intake, applicant screening, interview selection, candidate slates, recruiting workflows, hiring approvals or hiring recommendations, applicant data, and hiring-related reporting for Covered Positions.

56.     Danaher's control over the challenged hiring process included the ability to determine or influence which applicants were considered, which applicants were screened out, which applicants advanced to interviews, and which applicants were selected or rejected.

57.     For applicants rejected at the initial screening stage, Danaher's centralized recruiting infrastructure and Talent Acquisition processes operated as a gatekeeper, effectively determining whether those applicants would have any opportunity to compete for the Covered Positions.

58.     Thus, alternatively, because Danaher exerted significant control over the recruiting, screening, interview selection, and hiring process for applicants to positions at its OpCos, Danaher is a joint employer with respect to the challenged hiring practices.

## FACTUAL ALLEGATIONS
## DANAHER'S RECRUITING AND HIRING PRACTICES

59.     Danaher is the parent company of its OpCos, including Defendants Beckman

Coulter, Integrated DNA, Pall, Cytiva, and Abcam.

60.    Danaher publicly describes its businesses and brands as being united by the "Danaher Business System" or "DBS" which is a common set of tools, processes, and management practices used across the enterprise.[4]

**ABOUT DANAHER**

Danaher is a global science and technology innovator committed to helping its customers solve complex challenges and improving quality of life around the world. Its family of world class brands has leadership positions in the demanding and attractive health care, environmental and applied end-markets. With more than 20 operating companies, Danaher's globally diverse team of approximately 81,000 associates is united by a common culture and operating system, the Danaher Business System, and its Shared Purpose, *Helping Realize Life's Potential*. For more information, please visit www.danaher.com.

61.    DBS is not merely an aspirational set of corporate values. DBS is the mechanism through which Danaher implements, monitors, and enforces companywide operational, recruiting, talent-acquisition, human-resources, workforce-planning, hiring, performance-management, and personnel-decision practices across its operating companies.

62.    Through DBS and its centralized recruiting infrastructure, Danaher exercises control over the systems, workflows, criteria, data, and processes used to evaluate applicants for positions at Danaher and its OpCos.

63.    Additionally, through these centralized systems and practices, Danaher has the ability to determine or influence which applicants are considered, which applicants are screened out, which applicants advance to interviews, and which applicants are ultimately selected for hire.

---

[4] https://investors.danaher.com/2023-08-16-Danaher-Releases-2023-Sustainability-Report

64.     Those determinations were not made through individualized, position-by-position human judgment, but through centralized, standardized, and automated recruiting workflows applied across Danaher and its OpCos.

65.     Specifically, hiring managers received candidates only after the challenged systems and Talent Acquisition processes had screened, filtered, ranked, or advanced applicants.

66.     Danaher's centralized careers website advertises positions across its operating companies under the Danaher name and directs applicants for OpCo positions through Danaher-branded recruiting channels.[5]

67.     Applicants applying to OpCo positions are therefore funneled through Danaher-controlled or Danaher-integrated recruiting channels, rather than through a hiring process wholly separate from Danaher.

68.     Job advertisements for positions at different OpCos also commonly refer to the employer, recruiting process, or employment opportunity collectively as "Danaher," further demonstrating that applicants are presented with a common enterprise-wide recruiting platform rather than separate and independent hiring systems unique to each OpCo:

**Bring more to life.**

At Danaher, our work saves lives. And each of us plays a part. Fueled by our culture of continuous improvement, we turn ideas into impact – innovating at the speed of life.

Our 63,000+ associates work across the globe at more than 15 unique businesses within life sciences, diagnostics, and biotechnology.

Are you ready to accelerate your potential and make a real difference? At Danaher, you can build an incredible career at a leading science and technology company, where we're committed to hiring and developing from within. You'll thrive in a culture of belonging where you and your unique viewpoint matter.

Learn about the Danaher Business System which makes everything possible.

69.     This common platform reinforces Danaher's centralized control over applicant intake, applicant data, screening criteria, automated candidate-advancement decisions and hiring

---

[5] https://jobs.danaher.com/global/en/search-results?keywords=&from=10&s=1

14

related reporting across its OpCos.

70.    Danaher and its OpCos use Workday as a common or integrated applicant-tracking system to manage, maintain, and organize applicant and employee information across the enterprise.

71.    Workday serves as the initial centralized repository for applications, resumes, applicant profiles, recruiting communications, screening decisions, candidate-status designations, rejection decisions, and interview-selection data.

## Step 1
# Application

Once you find a role that fits your experience and career goals, submit your resume and additional details/information through our online portal. Afterwards, you will be prompted to set up a candidate homepage, which you can use to track your candidacy status and apply to additional roles.

72.    Through Workday, Danaher and its OpCos collect, store, organize, and process applications, resumes, applicant profiles, educational history, work history, recruiting communications, application status, interview selections, rejection decisions, and hiring outcomes.

73.    Workday is therefore the first stage of Danaher's challenged recruiting and screening process.

74.    At the Workday stage, applicants are required to submit information that is directly or indirectly correlated with age, including graduation dates, years of experience, complete employment histories, dates of prior employment, seniority, career progression, and other

information from which an applicant's age or approximate age can be inferred.



## Submitting your online application

When screening inbound applications our recruiters look for well-formatted, succinct resumes to help us understand your relevant work experience, projects and results you've delivered.

75. Because Workday collects and stores age-correlated information, Danaher and its OpCos had access to data from which they could determine, estimate, or infer whether applicants were age forty or older. That data included employment dates, graduation dates where provided, years of experience, seniority, job titles, and the length and progression of each applicant's career.

76. Plaintiffs' own applications and resumes contained age-correlated information from which Defendants could determine, estimate, or infer that Plaintiffs were age forty or older.

16

77.    Defendants therefore had access to information showing that each Plaintiff had a lengthy professional history consistent with membership in the ADEA-protected age group.

78.    Danaher and its OpCos used Workday not merely as a passive storage system, but as part of an applicant-tracking and screening workflow that organized, filtered, categorized, and advanced or rejected applicants, using information that included age-correlated data, during the initial stages of the hiring process.

79.    Through Workday, applicants for Covered Positions were processed through Danaher-controlled or Danaher-integrated recruiting systems, policies, workflows, screening criteria, reporting structures, and approval processes, rather than through wholly independent hiring systems maintained separately by each OpCo.

80.    After applications entered the Workday system, Danaher and its OpCos used Workday-based workflows, screening criteria, applicant data, and recruiting status designations to make initial determinations concerning which applicants would proceed in the hiring process.

81.    Those initial determinations were made by or through the Workday-based system and standardized workflow, before any individualized assessment of each applicant's qualifications by a hiring manager.

82.    Applicants who were not advanced through the Workday-based screening process were eliminated from consideration before they could meaningfully compete for the positions for which they applied.

83.    Meaning, Workday-based screening used their age in determining not to hire them.

84.    Applicants who survived the initial Workday-based screen were then passed to a second screening layer consisting of AI-assisted recruiting tools, automated ranking systems, or algorithmic candidate-evaluation technologies used by Danaher and its OpCos. Danaher publicly

17

represented that its recruiters use AI during the screening process.



**Screening with a Danaher recruiter**

Our recruiters, with the help of AI, will take this time to ask technical and clarifying questions and learn more about you. They will provide an overview of the role, Danaher and our businesses, as well as answer any preliminary questions you may have.

85.     This second AI-assisted screening layer further evaluated, ranked, filtered, scored, recommended, or screened applicants using the applicant data collected or maintained through Workday and Danaher's centralized recruiting systems.

86.     The AI-assisted screening layer relied on or incorporated age-correlated applicant information, including resumes, work history, education history, job titles, seniority indicators, graduation dates, years of experience, length of career, and other data points that correlate with whether an applicant is age forty or older.

87.     The combined Workday and AI-assisted screening process generated or determined the group of applicants who would be advanced from the general applicant pool to the "candidate" or interview stage.

88.     Applicants who did not progress beyond the initial applicant stage had no meaningful opportunity to interview for the position and were rejected.

89.     Through this process, Workday functioned as the initial intake and screening

system, AI-assisted recruiting tools further evaluated, ranked, filtered, or screened applicants, and the combined system produced or dictated the interview slate that hiring managers or interview panels received.

90.     This centralized process gave Danaher and its OpCos the ability to screen out older applicants before they were reviewed by hiring managers or given an opportunity to interview.

91.     Talent Acquisition did not conduct a fresh, individualized assessment of all applicants. Instead, Talent Acquisition implemented, relied upon, or accepted the filtered results of the Workday and AI-assisted screening process to determine which applicants would be placed on the interview slate.

92.     The result of these policies and practices was that, across Defendants' OpCos, applicants ages 40 and over were screened out, denied interviews, or not hired for Covered Positions despite being equally or more qualified than substantially younger applicants who advanced or were hired. Defendants' policies and practices thus had the intended purpose and result of excluding and disfavoring applicants ages 40 and over.

93.     As a direct result of Defendants' discriminatory recruiting and hiring practices, Plaintiffs and similarly situated applicants age 40 and older were denied equal employment opportunities, interviews, and positions for which they were qualified.

### CLAIMS OF REPRESENTATIVE PLAINTIFF WARREN

94.     Plaintiff Warren is a Cardiovascular Sales Representative who lives in Louisiana. He was born in 1967 and is currently fifty-nine (59) years old. He has more than twenty years of successful experience in medical and cardiovascular sales. He previously held successful pharmaceutical and diagnostic sales and account-management roles with companies including Purdue Pharma, Quest Diagnostics, and Novartis Pharmaceuticals, where he earned top regional

and national rankings.

95.    Plaintiff Warren's experience includes developing and maintaining key physician, hospital, laboratory, and healthcare-system relationships; managing complex sales cycles; growing customer accounts; promoting cardiovascular and diagnostic products; and consistently meeting or exceeding sales goals in competitive healthcare markets.

96.    On or about January 29, 2025, Plaintiff Warren applied for the position of Key Account Manager with Beckman Coulter.

97.    Warren's application reflected more than twenty years of medical, cardiovascular, pharmaceutical, diagnostic, and account-management experience.

98.    Plaintiff Warren met or exceeded all stated qualifications for the Key Account Manager position and was well qualified based on his long history of exceeding sales goals in cardiovascular and diagnostic products and his demonstrated ability to collaborate with internal and external stakeholders to manage and grow key accounts.

99.    Specifically, his background directly aligned with the core responsibilities of the role, including account growth, customer relationship management, cross-functional collaboration, territory development, strategic sales planning, and achievement of revenue objectives.

100.    His employment application was rejected by Beckman Coulter, a Danaher OpCo.

101.    Defendants rejected Plaintiff Warren at the initial screening stage despite his extensive and directly relevant qualifications.

102.    Due to Defendants' screening process, Plaintiff's age was used as a reason not to hire him.

103.    Therefore, Plaintiff Warren was excluded from consideration because of his age.

104.    For the position, Defendants selected or advanced a substantially younger

applicant, under 40, despite Warren's superior or comparable qualifications. The selected applicant had materially less experience in cardiovascular, diagnostic, laboratory, healthcare-system, and key-account sales than Warren, including less experience managing complex healthcare sales cycles and developing hospital, physician, laboratory, and healthcare-system relationships.

105. The selected or advanced applicant's age, identity, application materials, interview-stage status, and qualifications are reflected in Defendants' Workday, Talent Acquisition, interview-slate, and hiring records.

106. Plaintiff Warren remains able and ready to apply for Covered Positions with Beckman Coulter in the relatively near future and is presently deterred from applying because doing so would be futile so long as Defendants' challenged screening system remains in place.

## **CLAIMS OF REPRESENTATIVE PLAINTIFF COTE**

107. Plaintiff Cote is a Sales Representative who lives in Florida. She was born in 1965 and is currently sixty-one (61) years old. She has more than twenty-five years of experience in sales, including extensive experience selling diagnostic and life sciences products similar to those offered by Defendants.

108. Plaintiff Cote's experience includes account development, customer relationship management, consultative sales, territory growth, and sales of complex diagnostic and life-sciences products to sophisticated customers.

109. On or about March 14, 2025, Plaintiff Cote applied for the position of Key Account Manager with Integrated DNA Technologies, Inc.

110. Cote's application reflected more than twenty-five years of sales experience.

111. Plaintiff Cote met or exceeded all stated qualifications for this position and was well-qualified based on her extensive sales and account management experience.

112.    Plaintiff Cote's qualifications included developing strategic accounts, managing customer relationships, identifying growth opportunities, communicating technical product value, and meeting revenue goals.

113.    Her employment application was rejected by Integrated DNA Technologies, Inc., a Danaher OpCo.

114.    Integrated DNA Technologies rejected Plaintiff Cote at the initial screening stage despite her extensive and directly relevant experience.

115.    Integrated DNA Technologies and Danaher advanced, interviewed, and hired a substantially younger individual for the Key Account Manager position who was not more qualified than Plaintiff Cote. That individual had materially less experience in diagnostic and life-sciences sales, account development, consultative sales, and territory growth than Cote, whose application reflected more than twenty-five years of directly relevant experience.

116.    Plaintiff Cote was excluded from consideration because of her age. Defendants' screening process treated her decades of experience, seniority, and age-correlated work history as a negative factor rather than as evidence that she was qualified or more qualified for the position.

117.    The selected or advanced applicant's age, identity, application materials, interview-stage status, and qualifications are reflected in Defendants' Workday, Talent Acquisition, interview-slate, and hiring records.

118.    Plaintiff Cote remains able and ready to apply for Covered Positions with Integrated DNA Technologies in the relatively near future and is presently deterred from applying because doing so would be futile so long as Defendants' challenged screening system remains in place.

### CLAIMS OF REPRESENTATIVE PLAINTIFF BUNENKO

119.    Plaintiff Bunenko is a Director of Business Development who lives in California.

He was born in 1960 and is currently sixty-six (66) years old.  He has decades of experience in senior-level sales, business development, and account management in the life sciences and related industries, including managing sales teams and multimillion-dollar customer accounts.

120.    Plaintiff Bunenko's experience includes strategic account leadership, sales-team management, business-development planning, revenue growth, customer expansion, and management of complex sales relationships in technical and life-sciences markets.

121.    Plaintiff Bunenko applied for multiple positions for which he was qualified with Danaher and its OpCos, including: (a) Senior Sales Manager at Beckman Coulter on or about June 25, 2025; (b) Regional Sales Manager at Pall on or about September 2, 2025; (c) Global Strategic Account Director at Cytiva on or about October 23, 2025; and (d) Director of Sales at Abcam on or about October 15, 2025.

122.    Bunenko's application reflected decades of senior sales, business-development, and sales-leadership experience.

123.    For each of these positions, Plaintiff Bunenko met or exceeded the stated qualifications and was well-qualified based on his decades of business development, sales leadership, and strategic account experience, and growing a $25 million sales territory in the life sciences and related markets.

124.    His qualifications directly matched the responsibilities of the positions, including managing sales personnel, developing business strategies, growing key accounts, overseeing revenue performance, leading customer-facing teams, and expanding market share.

125.    Despite meeting the requirements, Plaintiff Bunenko was rejected for every position for which he applied.

126.    Defendants rejected him at the initial screening stage for each role, preventing him

23

from meaningfully competing for positions for which he was qualified or more qualified than younger applicants.

127.    Defendants advanced, interviewed, and hired substantially younger individuals for one or more of these positions who were not more qualified than Plaintiff Bunenko.

128.    Specifically, Defendants' Workday, Talent Acquisition, interview-slate, and hiring records will identify the younger applicants advanced or selected for each position and show that those applicants had materially less sales-leadership, business-development, strategic-account, and multimillion-dollar territory-management experience than Bunenko.

129.    Plaintiff Bunenko was excluded from consideration because of his age.

130.    Plaintiff Bunenko remains able and ready to apply for Covered Positions with Beckman Coulter, Pall, Cytiva and Abcam in the relatively near future and is presently deterred from applying because doing so would be futile so long as Defendants' challenged screening system remains in place.

## CLAIMS OF REPRESENTATIVE PLAINTIFF BRIHMAT

131.    Plaintiff Brihmat is a sales professional who lives in New York. He was born in 1966 and is currently sixty (60) years old. He has more than twenty years of experience in sales and account management, including in highly technical and regulated industries.

132.    Plaintiff Brihmat's experience includes sales leadership, account strategy, business development, customer relationship management, and sales of complex products and services in sophisticated markets.

133.    Plaintiff Brihmat applied for multiple positions for which he was qualified with Danaher and its OpCos, including: (a) North America Sales Leader at Pall Corporation on or about April 24, 2025; and (b) Senior Sales Manager on or about June 23, 2025.

134.    Plaintiff Brihmat's application reflected more than twenty years of sales and account-management experience.

135.    For each of these positions, Plaintiff Brihmat met or exceeded the stated qualifications and was well-qualified based on his extensive experience in sales, account management, and sales leadership in technical and regulated industries.

136.    His experience aligned with the roles' requirements, including leading sales initiatives, managing accounts, developing business opportunities, driving revenue growth, and working with sophisticated customers in regulated or technical sectors.

137.    Despite meeting the requirements, Plaintiff Brihmat was denied the positions.

138.    Defendants rejected him at the initial screening stage, preventing him from being meaningfully considered for positions for which he was qualified or more qualified than younger applicants.

139.    Defendants advanced, interviewed, and hired substantially younger individuals for one or more of the positions to which Plaintiff Brihmat applied, including the North America Sales Leader position at Pall Corporation, despite those individuals not being more qualified than Plaintiff Brihmat.

140.    Those selected or advanced applicants were under forty or substantially younger than Brihmat, and Defendants' applicant-flow, interview-slate, Workday, Talent Acquisition, and hiring records identify those individuals and their qualifications.

141.    Plaintiff Brihmat was excluded from consideration because of his age.

142.    The selected or advanced applicants had materially less sales-leadership, account-strategy, business-development, and regulated-industry sales experience than Brihmat. Defendants' screening process treated Brihmat's age-correlated experience, seniority, and lengthy

work history as negative factors and excluded him from consideration because of age.

143.     Plaintiff Brihmat remains able and ready to apply for Covered Positions with Pall in the relatively near future and is presently deterred from applying because doing so would be futile so long as Defendants' challenged screening system remains in place.

## DEFINITIONS

144.     For purposes of the classes and collective alleged below, an applicant is "not advanced" where Defendants' records reflect that the applicant was screened out, rejected, coded not advanced, or otherwise removed from consideration during the pre-interview recruiting workflow before any first interview or individualized hiring-manager review.

145.     For purposes of the classes and collective alleged below, "qualified applicants" means applicants whose submitted application materials facially reflected the requisition's stated minimum objective qualifications, or whose records do not show rejection for an expressly stated hard-stop requirement, as reflected in Defendants' job postings, requisition records, application materials, candidate-stage data, and screening records.

146.     For purposes of the classes and collective alleged below, the members of each class are ascertainable from Defendants' records, including Workday applicant data, applicant profiles, resumes, job requisition records, application-status histories, rejection notices, candidate-stage designations, interview records, Talent Acquisition notes, AI-assisted screening records, and hiring outcomes.

147.     For purposes of the classes and collective alleged below, "Covered Positions" means any external position that is routed through Defendants' common Workday/Talent Acquisition recruiting workflow before any first interview or individualized hiring-manager review.

26

## COLLECTIVE ACTION ALLEGATIONS

148.    Plaintiffs bring this collective action pursuant to 29 U.S.C. §§ 216(b), 626(b) seeking liability-phase injunctive and declaratory relief on behalf of a collective of all individuals age forty (40) or older who are ready and willing to apply for Covered Positions with Danaher, Beckman Coulter, Integrated DNA Technologies, Pall Corporation, Cytiva, or Abcam in the United States through Defendants' common Workday/Talent Acquisition recruiting workflow, and who would be subjected to Defendants' challenged pre-interview screening process before any first interview or individualized hiring-manager review.

149.    Plaintiffs also bring this collective action pursuant to 29 U.S.C. §§ 216(b), 626(b) for monetary damages and other make-whole relief on behalf of a collective of all individuals age forty (40) or older who during the applicable ADEA limitations period, applied for a Covered Position with Danaher, Beckman Coulter, Integrated DNA Technologies, Pall Corporation, Cytiva, or Abcam in the United States through Defendants' common Workday/Talent Acquisition recruiting workflow; whose application materials facially reflected the requisition's stated minimum objective qualifications or who were not screened out for an expressly stated hard-stop requirement; and who were not advanced to a first interview or individualized hiring-manager review because they were rejected, screened out, or designated not advanced during Defendants' challenged pre-interview screening process.

150.    Defendants used a centralized decision-making process in which applications first entered Workday, where applicant profiles, resumes, employment histories, education histories, candidate-status designations, screening decisions, rejection decisions, and hiring outcomes were collected, stored, organized, and processed. Applications were screened through standardized Workday-based workflows, Talent Acquisition procedures, DBS-governed recruiting practices,

27

and AI-assisted recruiting tools before hiring managers or interview panels received the resulting candidate slate.

151.    Plaintiffs and other potential members of the ADEA collective are similarly situated because they:

(a) were age forty (40) or older when they applied;

(b) applied, or are ready and willing to apply, for the same category of Covered Positions through the same centralized recruiting workflow;

(c) were subjected, or would be subjected, to the same pre-interview screening architecture before any individualized hiring-manager review;

(d) were not rejected based on position-specific "knockout" criteria pursuant to recruiting records, and

(e) challenge the same alleged use of age-correlated data and candidate-advancement rules at that gatekeeping stage. Plaintiffs' and collective members' claims arise from common challenged policies and practices, including Defendants' collection and use of age-correlated applicant information, standardized screening workflows, AI-assisted candidate evaluation, centralized applicant-status designations, and uniform candidate-advancement practices. These claims do not depend on isolated, unrelated hiring decisions made only after individualized hiring-manager review. Instead, they arise from Defendants' enterprise-wide recruiting infrastructure, which operated as a gatekeeping system before applicants could meaningfully compete for interviews or hiring-manager consideration.

152.    Named Plaintiffs are similarly situated because they are ready and willing to apply as all of them remain able and ready to apply for Covered Positions with Danaher in the relatively

near future and are presently deterred from applying because doing so would be futile so long as Defendants' challenged screening system remains in place.

153. Defendants' centralized recruiting and screening process created common evidence for Plaintiffs' and collective members' claims, including Workday applicant records, resumes, application profiles, candidate-stage data, rejection notices, screening criteria, interview-slate records, Talent Acquisition notes, AI-assisted screening records, job requisition data, applicant-flow data, hiring outcomes, and records reflecting the age-correlated information Defendants collected and used.

154. There are many similarly situated collective members who would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit. Notice should be sent to the collective pursuant to 29 U.S.C. §§ 216(b), 626(b).

155. The identities and contact information of potential collective members are ascertainable from Defendants' Workday data, applicant-tracking records, candidate profiles, job requisition records, rejection notices, candidate-stage designations, interview records, and hiring outcomes.

156. As part of its regular business practice, Defendants have intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the ADEA with respect to Plaintiffs and the collective. This policy and pattern or practice includes, but is not limited to:

      a. willfully utilizing a biased recruiting system for Covered Positions that excludes, and discriminates against workers ages 40 and over;

      b. unlawfully soliciting age-related information in the application process for the purpose of screening and excluding older applicants;

      c. willfully implementing a discriminatory AI driven application process that

screened out applicants ages 40 and over; and

    d.   willfully using a common pre-interview recruiting and screening workflow to reject, screen out, or decline to advance qualified applicants age 40 and over before any first interview or individualized hiring-manager review.

157.    Danaher maintained and implemented these policies and practices with the purpose and effect of denying Plaintiffs and other members of the collective employment opportunities because of their age. These policies cannot be justified on the basis of reasonable factors other than age.

158.    Defendants are aware that federal law requires them to conduct recruitment, screening, interviewing, and hiring for the Covered Positions without regard to an applicant's age.

## CLASS ACTION ALLEGATIONS UNDER THE STATE LAWS

### *Florida*

159.    Plaintiff Cote also brings this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and in the alternative 23(c)(4) seeking liability-phase injunctive and declaratory relief under the FCRA on behalf of a class of all applicants, ages 40 and older, who are ready and willing to apply for Covered Positions in Florida with Integrated DNA Technologies, Inc. through Defendants' common Workday/Talent Acquisition recruiting workflow and who would be subjected to Defendants' challenged pre-interview screening process before any first interview or individualized hiring-manager review.

160.    Plaintiff Cote also brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) for monetary damages and other make-whole relief under the FCRA on behalf of a class of all qualified applicants, ages 40 and older, who during the applicable FCRA limitations period, applied for a Covered Position in Florida with Integrated DNA Technologies,

Inc. through Defendants' common Workday/Talent Acquisition recruiting workflow; whose application materials facially reflected the requisition's stated minimum objective qualifications or who were not screened out for an expressly stated hard-stop requirement; who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records; and who were not advanced to a first interview or individualized hiring-manager review because they were rejected, screened out, or designated not advanced during Defendants' challenged pre-interview screening process.

161.    Plaintiff is a member of the class she seeks to represent.

162.    Plaintiff Cote's interest in prospective relief is also typical of the Florida class because she remains able and ready to apply for Covered Positions in Florida with Integrated DNA Technologies, Inc. in the relatively near future, and is presently deterred from doing so because applying would be futile so long as Defendants' challenged Workday, Talent Acquisition, DBS-governed, and AI-assisted pre-interview screening system remains in place. Plaintiff Cote therefore faces the same ongoing and imminent threat of future injury from Defendants' challenged practices as the members of the Florida injunctive class.

163.    The members of the class identified herein are so numerous that joinder of all members is impracticable.

164.    Based on Defendants' nationwide operations, the number of Covered Positions posted during the relevant period, and the volume of applicants processed through Defendants' centralized recruiting systems, Plaintiff Cote estimates that the Florida classes include hundreds of applicants age forty (40) or older, and in any event more than forty members.

165.    The precise number and identities of Florida class members are ascertainable from Defendants' Workday data, applicant profiles, resumes, application-status records, rejection

notices, candidate-stage designations, interview records, Talent Acquisition records, AI-assisted screening records, and hiring outcomes.

166.    There are questions of law and fact common to the class, and these questions predominate over any questions affecting only individual members. Common questions include, among others:

(a) whether Defendants used centralized Workday, Talent Acquisition, DBS-governed, or AI-assisted recruiting systems to screen applicants for Covered Positions;

(b) whether Defendants collected and used age-correlated applicant information, including years of experience, seniority, work history, employment dates, education history, graduation dates, career progression, and lengthy professional experience;

(c) whether Defendants' challenged screening and candidate-advancement practices intentionally disfavored applicants ages forty (40) and older;

(d) whether Defendants' policies and practices violated the FCRA;

(e) whether age is a bona fide occupational qualification; and

(f) whether equitable remedies, injunctive relief, economic damages, compensatory damages, and punitive damages for the class are warranted.

167.    Plaintiff Cote's claims are typical of the claims of the Florida class because she was age forty (40) or older, applied for a Covered Position in Florida with Integrated DNA Technologies, Inc., met or exceeded the stated minimum qualifications, was processed through Defendants' challenged recruiting and screening system, and was rejected despite being qualified.

168.    Plaintiff Cote will fairly and adequately represent and protect the interests of the members of the Florida class. Her interests are aligned with those of the Florida class because she

challenges the same recruiting and screening practices and seeks the same categories of relief. Plaintiff has retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

169. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief because Defendants acted or refused to act on grounds generally applicable to the class, making appropriate declaratory and injunctive relief with respect to Plaintiff and the class as a whole. The class members are entitled to injunctive relief to end Defendants' common, uniform, unfair, and discriminatory policies and practices. Plaintiff does not seek individualized monetary relief through Rule 23(b)(2).

170. Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the class, including whether Defendants used centralized recruiting and screening systems that intentionally disfavored applicants age forty (40) and older.

171. A class action is superior to other available methods because individual applicants are unlikely to possess the records necessary to prove the challenged centralized practices, while Defendants' own records provide common proof of applicant status, qualifications, screening, rejection, interview selection, and hiring outcomes. The class members have been damaged and are entitled to recovery as a result of Defendants' common, uniform, unfair, and discriminatory policies and practices. The propriety and amount of punitive damages are based on Defendants' conduct, making these issues common to the class.

### *Louisiana*

172. Plaintiff Warren also brings this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and in the alternative 23(c)(4), seeking liability-phase injunctive and

33

declaratory relief under the LEDL on behalf of a class of all applicants, ages 40 and older, who are ready and willing to apply for Covered Positions in Louisiana with Beckman Coulter, Inc. through Defendants' common Workday/Talent Acquisition recruiting workflow and who would be subjected to Defendants' challenged pre-interview screening process before any first interview or individualized hiring-manager review.

173.    Plaintiff Warren also brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) for monetary damages and other make-whole relief under the LEDL on behalf of a class of all applicants age 40 and older who, during the applicable LEDL limitations period, applied for a Covered Position in Louisiana with Beckman Coulter, Inc. through Defendants' common Workday/Talent Acquisition recruiting workflow; whose application materials facially reflected the requisition's stated minimum objective qualifications or who were not screened out for an expressly stated hard-stop requirement; who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records; and who were not advanced to a first interview or individualized hiring-manager review because they were rejected, screened out, or designated not advanced during Defendants' challenged pre-interview screening process.

174.    Plaintiff Warren is a member of the class he seeks to represent.

175.    Plaintiff Warren's interest in prospective relief is also typical of the Louisiana class because he remains able and ready to apply for Covered Positions in Louisiana with Beckman Coulter, Inc. in the relatively near future, and is presently deterred from doing so because applying would be futile so long as Defendants' challenged Workday, Talent Acquisition, DBS-governed, and AI-assisted pre-interview screening system remains in place. Plaintiff Warren therefore faces the same ongoing and imminent threat of future injury from Defendants' challenged practices as the members of the Louisiana injunctive class.

34

176. The members of the class identified herein are so numerous that joinder of all members is impracticable.

177. Based on Defendants' nationwide operations, the number of Covered Positions posted during the relevant period, and the volume of applicants processed through Defendants' centralized recruiting systems, Plaintiff Warren estimates that the Louisiana classes include hundreds of applicants age forty (40) or older, and in any event more than forty members.

178. The precise number and identities of Louisiana class members are ascertainable from Defendants' Workday data, applicant profiles, resumes, application-status records, rejection notices, candidate-stage designations, interview records, Talent Acquisition records, AI-assisted screening records, and hiring outcomes.

179. There are questions of law and fact common to the class, and these questions predominate over any questions affecting only individual members. Common questions include, among others:

(a) whether Defendants used centralized Workday, Talent Acquisition, DBS-governed, or AI-assisted recruiting systems to screen applicants for Covered Positions;

(b) whether Defendants collected and used age-correlated applicant information, including years of experience, seniority, work history, employment dates, education history, graduation dates, career progression, and lengthy professional experience;

(c) whether Defendants' challenged screening and candidate-advancement practices intentionally disfavored applicants ages forty (40) and older;

(d) whether Defendants' policies and practices violated the LEDL;

(e) whether age is a bona fide occupational qualification; and

(f) whether equitable remedies, injunctive relief, economic damages, compensatory damages, and punitive damages for the class are warranted.

180. Plaintiff Warren's claims are typical of the claims of the Louisiana class because he was age forty (40) or older, applied for a Covered Position in Louisiana with Beckman Coulter, met or exceeded the stated minimum qualifications, was processed through Defendants' challenged recruiting and screening system, and was rejected despite being qualified.

181. Plaintiff Warren will fairly and adequately represent and protect the interests of the members of the Louisiana class. His interests are aligned with those of the Louisiana class because he challenges the same recruiting and screening practices and seeks the same categories of relief. Plaintiff has retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

182. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief because Defendants acted or refused to act on grounds generally applicable to the class, making appropriate declaratory and injunctive relief with respect to Plaintiff and the class as a whole. The class members are entitled to injunctive relief to end Defendants' common, uniform, unfair, and discriminatory policies and practices. Plaintiff does not seek individualized monetary relief through Rule 23(b)(2).

183. Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the class, including whether Defendants used centralized recruiting and screening systems that intentionally disfavored applicants age forty (40) and older.

184. A class action is superior to other available methods because individual applicants are unlikely to possess the records necessary to prove the challenged centralized practices, while

36

Defendants' own records provide common proof of applicant status, qualifications, screening, rejection, interview selection, and hiring outcomes. The class members have been damaged and are entitled to recovery as a result of Defendants' common, uniform, unfair, and discriminatory policies and practices. The propriety and amount of punitive damages are based on Defendants' conduct, making these issues common to the class.

### *California*

185.   Plaintiff Bunenko brings this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (c)(4) seeking liability-phase injunctive and declaratory relief under the FEHA on behalf of a class of all applicants, ages 40 and older, who are ready and willing to apply for Covered Positions in California with Beckman Coulter, Inc., Pall Corporation, Cytiva, or Abcam through Defendants' common Workday/Talent Acquisition recruiting workflow and who would be subjected to Defendants' challenged pre-interview screening process before any first interview or individualized hiring-manager review.

186.   Plaintiff Bunenko's interest in prospective relief is also typical of the California class because he remains able and ready to apply for Covered Positions in California with Beckman Coulter, Inc., Pall Corporation, Cytiva, and Abcam in the relatively near future, and is presently deterred from doing so because applying would be futile so long as Defendants' challenged Workday, Talent Acquisition, DBS-governed, and AI-assisted pre-interview screening system remains in place. Plaintiff Bunenko therefore faces the same ongoing and imminent threat of future injury from Defendants' challenged practices as the members of the California injunctive class and subclasses.

187.   Pursuant to Rule 23(c)(4), Plaintiff Bunenko seeks certification of common California liability issues including whether Defendants used a common pre-interview screening

37

workflow for those Covered Positions, whether that workflow collected and used age-correlated information, whether Danaher controlled or materially influenced that workflow, and whether use of that workflow violated FEHA.

188.    Plaintiff Bunenko also brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) for monetary damages and other make-whole relief under the FEHA on behalf of the following subclasses:

189.    **Beckman Coulter California Damages Subclass**: all applicants age 40 and older who, during the applicable FEHA limitations period, applied for a Covered Position in California with Beckman Coulter, Inc. through Defendants' common Workday/Talent Acquisition recruiting workflow; whose application materials facially reflected the requisition's stated minimum objective qualifications or who were not screened out for an expressly stated hard-stop requirement; who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records; and who were not advanced to a first interview or individualized hiring-manager review because they were rejected, screened out, or designated not advanced during Defendants' challenged pre-interview screening process.

190.    **Pall California Damages Subclass**: all applicants age 40 and older who, during the applicable FEHA limitations period, applied for a Covered Position in California with Pall Corporation through Defendants' common Workday/Talent Acquisition recruiting workflow; whose application materials facially reflected the requisition's stated minimum objective qualifications or who were not screened out for an expressly stated hard-stop requirement; who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records; and who were not advanced to a first interview or individualized hiring-manager review because they were rejected, screened out, or designated not advanced during Defendants' challenged pre-

interview screening process.

191.    **Cytiva California Damages Subclass**: all applicants age 40 and older who, during the applicable FEHA limitations period, applied for a Covered Position in California with Cytiva through Defendants' common Workday/Talent Acquisition recruiting workflow; whose application materials facially reflected the requisition's stated minimum objective qualifications or who were not screened out for an expressly stated hard-stop requirement; who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records; and who were not advanced to a first interview or individualized hiring-manager review because they were rejected, screened out, or designated not advanced during Defendants' challenged pre-interview screening process.

192.    **Abcam California Damages Subclass**: all applicants age 40 and older who, during the applicable FEHA limitations period, applied for a Covered Position in California with Abcam through Defendants' common Workday/Talent Acquisition recruiting workflow; whose application materials facially reflected the requisition's stated minimum objective qualifications or who were not screened out for an expressly stated hard-stop requirement; who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records; and who were not advanced to a first interview or individualized hiring-manager review because they were rejected, screened out, or designated not advanced during Defendants' challenged pre-interview screening process.

193.    Plaintiff Bunenko is a member of the class he seeks to represent.

194.    The members of the class identified herein are so numerous that joinder of all members is impracticable.

195.    Based on Defendants' nationwide operations, the number of Covered Positions

posted during the relevant period, and the volume of applicants processed through Defendants' centralized recruiting systems, Plaintiff Bunenko estimates that the California classes include hundreds of applicants age forty (40) or older, and in any event more than forty members.

196.    The precise number and identities of California class members are ascertainable from Defendants' Workday data, applicant profiles, resumes, application-status records, rejection notices, candidate-stage designations, interview records, Talent Acquisition records, AI-assisted screening records, and hiring outcomes.

197.    There are questions of law and fact common to the class, and these questions predominate over any questions affecting only individual members. Common questions include, among others:

(a) whether Defendants used centralized Workday, Talent Acquisition, DBS-governed, or AI-assisted recruiting systems to screen applicants for Covered Positions;

(b) whether Defendants collected and used age-correlated applicant information, including years of experience, seniority, work history, employment dates, education history, graduation dates, career progression, and lengthy professional experience;

(c) whether Defendants' challenged screening and candidate-advancement practices intentionally disfavored applicants ages forty (40) and older;

(d) whether Defendants' policies and practices violated the FEHA;

(e) whether age is a bona fide occupational qualification; and

(f) whether equitable remedies, injunctive relief, economic damages, compensatory damages, and punitive damages for the class are warranted.

198.    Plaintiff Bunenko's claims are typical of the claims of the California classes

40

because he was age forty (40) or older, applied for Covered Positions in California with Beckman Coulter, Pall, Cytiva, and Abcam, met or exceeded the stated minimum qualifications, was processed through Defendants' challenged recruiting and screening system, and was rejected despite being qualified.

199.    Plaintiff Bunenko will fairly and adequately represent and protect the interests of the members of the California classes. His interests are aligned with those of the California classes because he challenges the same recruiting and screening practices and seeks the same categories of relief. Plaintiff has retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

200.    Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief because Defendants acted or refused to act on grounds generally applicable to the class, making appropriate declaratory and injunctive relief with respect to Plaintiff and the class as a whole. The class members are entitled to injunctive relief to end Defendants' common, uniform, unfair, and discriminatory policies and practices. Plaintiff does not seek individualized monetary relief through Rule 23(b)(2).

201.    Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the classes, including whether Defendants used centralized recruiting and screening systems that intentionally disfavored applicants age forty (40) and older.

202.    A class action is superior to other available methods because individual applicants are unlikely to possess the records necessary to prove the challenged centralized practices, while Defendants' own records provide common proof of applicant status, qualifications, screening, rejection, interview selection, and hiring outcomes. The class members have been damaged and

41

are entitled to recovery as a result of Defendants' common, uniform, unfair, and discriminatory policies and practices. The propriety and amount of punitive damages are based on Defendants' conduct, making these issues common to the class.

### *New York*

203.    Plaintiff Brihmat also brings this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and in the alternative 23(c)(4) seeking liability-phase injunctive and declaratory relief under the NYSHRL on behalf of a class of all applicants ages 40 and older, who are ready and willing to apply for Covered Positions in New York with Pall Corporation through Defendants' common Workday/Talent Acquisition recruiting workflow and who would be subjected to Defendants' challenged pre-interview screening process before any first interview or individualized hiring-manager review.

204.    Plaintiff Brihmat also brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) for monetary damages and other make-whole relief under the NYSHRL on behalf of a class of applicants age 40 and older who, during the applicable NYSHRL limitations period, applied for a Covered Position in New York with Pall Corporation through Defendants' common Workday/Talent Acquisition recruiting workflow; whose application materials facially reflected the requisition's stated minimum objective qualifications or who were not screened out for an expressly stated hard-stop requirement; who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records; and who were not advanced to a first interview or individualized hiring-manager review because they were rejected, screened out, or designated not advanced during Defendants' challenged pre-interview screening process.

205.    Plaintiff Brihmat is a member of the class he seeks to represent.

206.    Plaintiff Brihmat's interest in prospective relief is also typical of the New York class

because he remains able and ready to apply for Covered Positions in New York with Pall Corporation in the relatively near future, and is presently deterred from doing so because applying would be futile so long as Defendants' challenged Workday, Talent Acquisition, DBS-governed, and AI-assisted pre-interview screening system remains in place. Plaintiff Brihmat therefore faces the same ongoing and imminent threat of future injury from Defendants' challenged practices as the members of the New York injunctive class.

207.    The members of the class identified herein are so numerous that joinder of all members is impracticable.

208.    Based on Defendants' nationwide operations, the number of Covered Positions posted during the relevant period, and the volume of applicants processed through Defendants' centralized recruiting systems, Plaintiff Brihmat estimates that the New York classes include hundreds of applicants age forty (40) or older, and in any event more than forty members.

209.    The precise number and identities of New York class members are ascertainable from Defendants' Workday data, applicant profiles, resumes, application-status records, rejection notices, candidate-stage designations, interview records, Talent Acquisition records, AI-assisted screening records, and hiring outcomes.

210.    There are questions of law and fact common to the class, and these questions predominate over any questions affecting only individual members. Common questions include, among others:

> (a) whether Defendants used centralized Workday, Talent Acquisition, DBS-governed, or AI-assisted recruiting systems to screen applicants for Covered Positions;
>
> (b) whether Defendants collected and used age-correlated applicant

43

information, including years of experience, seniority, work history, employment dates, education history, graduation dates, career progression, and lengthy professional experience;

(c) whether Defendants' challenged screening and candidate-advancement practices intentionally disfavored applicants ages forty (40) and older;

(d) whether Defendants' policies and practices violated the NYSHRL;

(e) whether age is a bona fide occupational qualification; and

(f) whether equitable remedies, injunctive relief, economic damages, compensatory damages, and punitive damages for the class are warranted.

211.    Plaintiff Brihmat's claims are typical of the claims of the New York class because he was age forty (40) or older, applied for a Covered Position in New York with Pall, met or exceeded the stated minimum qualifications, was processed through Defendants' challenged recruiting and screening system, and was rejected despite being qualified.

212.    Plaintiff Brihmat will fairly and adequately represent and protect the interests of the members of the New York class. His interests are aligned with those of the New York class because he challenges the same recruiting and screening practices and seeks the same categories of relief. Plaintiff has retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

213.    Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief because Defendants acted or refused to act on grounds generally applicable to the class, making appropriate declaratory and injunctive relief with respect to Plaintiff and the class as a whole. The class members are entitled to injunctive relief to end Defendants' common, uniform, unfair, and discriminatory policies and practices. Plaintiff does not

44

seek individualized monetary relief through Rule 23(b)(2).

214. Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the class, including whether Defendants used centralized recruiting and screening systems that intentionally disfavored applicants age forty (40) and older.

215. A class action is superior to other available methods because individual applicants are unlikely to possess the records necessary to prove the challenged centralized practices, while Defendants' own records provide common proof of applicant status, qualifications, screening, rejection, interview selection, and hiring outcomes. The class members have been damaged and are entitled to recovery as a result of Defendants' common, uniform, unfair, and discriminatory policies and practices. The propriety and amount of punitive damages are based on Defendants' conduct, making these issues common to the class.

**CAUSES OF ACTION**
**FIRST CLAIM FOR RELIEF**
**Intentional Discrimination**
**(Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 623(a)(1))**
**(On Behalf of Plaintiffs and the Collective)**

216. Named Plaintiffs incorporate the preceding paragraphs 1-158 as alleged above.

217. Danaher engages in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against applicants and prospective applicants ages 40 and older. Danaher has intentionally discriminated against Plaintiffs and the collective in violation of the ADEA by, among other things:

    a. willfully utilizing a biased recruiting system for Covered Positions that excludes, and discriminates against workers ages 40 and over;

    b. unlawfully soliciting age-related information in the application process for purpose of screening and excluding older applicants;

45

c.  willfully implementing a discriminatory AI driven application process that screened out applicants ages 40 and over; and

d.  willfully using a common pre-interview recruiting and screening workflow to reject, screen out, or decline to advance qualified applicants age 40 and over before any first interview or individualized hiring-manager review.

218.  These company-wide policies are intended to and do have the effect of denying Plaintiffs and the collective employment opportunities because of their age. The discriminatory acts that constitute Danaher's pattern and/or practice of discrimination have occurred both within and outside the liability period in this case.

219.  Age is not a bona fide occupational qualification for the Covered Positions.

220.  As a direct result of Danaher's discriminatory policies and/or practices as described above, Plaintiffs and the collective have suffered damages including, but not limited to, lost past and future income, liquidated damages, punitive damages, compensation, and benefits.

221.  The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by 29 U.S.C. § 623(a)(1).

222.  Plaintiffs request relief as hereinafter described.

**SECOND CLAIM FOR RELIEF**
**Intentional Age Discrimination**
**Florida Civil Rights Act §760.01-760.11 (On Behalf of Plaintiff Cote and the Florida Class)**

223.  Plaintiff Cote incorporates the preceding paragraphs 1-93; 107-118; 144-147; 159-171 as alleged above.

224.  Danaher and Integrated DNA engage in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against applicants and prospective applicants ages 40 and older applied for Covered Positions in Florida. Danaher and Integrated DNA intentionally discriminated against Plaintiff and the Florida class in violation of the FCRA

by, among other things:

    a.   willfully utilizing a biased recruiting system for Covered Positions that excludes, and discriminates against workers ages 40 and over;

    b.   unlawfully soliciting age-related information in the application process for purpose of screening and excluding older applicants;

    c.   willfully implementing a discriminatory AI driven application process that screened out applicants ages 40 and over; and

    d.   willfully using a common pre-interview recruiting and screening workflow to reject, screen out, or decline to advance qualified applicants age 40 and over before any first interview or individualized hiring-manager review.

225.   These company-wide policies are intended to and do have the effect of denying Plaintiff and the Florida Class employment opportunities in Florida because of their age. The discriminatory acts that constitute Danaher's pattern and/or practice of discrimination have occurred both within and outside the liability period in this case.

226.   Age is not a bona fide occupational qualification for the Covered Positions.

227.   As a direct result of the discriminatory policies and/or practices as described above, Plaintiff and the Florida Class have suffered damages including, but not limited to, lost past and future income, liquidated damages, punitive damages, compensation, and benefits.

228.   The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by the FCRA.

**THIRD CLAIM FOR RELIEF**
**Intentional Age Discrimination**
**Louisiana Employment Discrimination Law, LA Rev Stat § 23:312 ("LEDL")**
**(On Behalf of Plaintiff Warren and the Louisiana Class)**

229.   Plaintiff Warren incorporates the preceding paragraphs 1-93; 94-106; 144-147;

47

172-189 as alleged above.

230.    Danaher engages in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against applicants and prospective applicants ages 40 and older who applied for Covered Positions in Louisiana. Danaher has intentionally discriminated against Plaintiff and the Louisiana class in violation of the LEDL by, among other things:

    a.   willfully utilizing a biased recruiting system for Covered Positions that excludes, and discriminates against workers ages 40 and over;

    b.   unlawfully soliciting age-related information in the application process for purpose of screening and excluding older applicants;

    c.   willfully implementing a discriminatory AI driven application process that screened out applicants ages 40 and over; and

    d.   willfully using a common pre-interview recruiting and screening workflow to reject, screen out, or decline to advance qualified applicants age 40 and over before any first interview or individualized hiring-manager review.

231.    These company-wide policies are intended to and do have the effect of denying Plaintiff and the Louisiana Class employment opportunities in Louisiana because of their age. The discriminatory acts that constitute Danaher's pattern and/or practice of discrimination have occurred both within and outside the liability period in this case.

232.    Age is not a bona fide occupational qualification for the Covered Positions.

233.    As a direct result of Danaher and Beckman Coulter's discriminatory policies and/or practices as described above, Plaintiff and the Louisiana Class have suffered damages including, but not limited to, lost past and future income, liquidated damages, punitive damages, compensation, and benefits.

234.    The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by the LEDL.

**FOURTH CLAIM FOR RELIEF**
**Intentional Age Discrimination**
**California Fair Employment and Housing Act, Gov. Code § 12940 et seq. ("FEHA")**
**(On Behalf of Plaintiff Bunenko and the California Class)**

235.    Plaintiff Bunenko incorporates the preceding paragraphs 1-93; 119-130; 144-147; 185-202 as alleged above.

236.    Danaher engages in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against applicants and prospective applicants ages 40 and older who applied for Covered Positions in California. Danaher, Beckman Coulter, Pall, Cytiva, and Abcam have intentionally discriminated against Plaintiff and the California class in violation of the FEHA by, among other things:

a.    willfully utilizing a biased recruiting system for Covered Positions that excludes, and discriminates against workers ages 40 and over;

b.    unlawfully soliciting age-related information in the application process for purpose of screening and excluding older applicants;

c.    willfully implementing a discriminatory AI driven application process that screened out applicants ages 40 and over; and

d.    willfully using a common pre-interview recruiting and screening workflow to reject, screen out, or decline to advance qualified applicants age 40 and over before any first interview or individualized hiring-manager review.

237.    These company-wide policies are intended to and do have the effect of denying Plaintiff and the California Class employment opportunities in California because of their age. The discriminatory acts that constitute Danaher, Beckman Coulter, Pall, Cytiva, and Abcam's pattern

49

and/or practice of discrimination have occurred both within and outside the liability period in this case.

238.    Age is not a bona fide occupational qualification for the Covered Positions.

239.    As a direct result of Danaher's discriminatory policies and/or practices as described above, Plaintiff and the California Class have suffered damages including, but not limited to, lost past and future income, liquidated damages, punitive damages, compensation, and benefits.

240.    The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by the FEHA.

**FIFTH CLAIM FOR RELIEF**
**Intentional Age Discrimination**
**New York State Human Rights Law, Article 15 §§ 290-301("NYSHRL")**
**(On Behalf of Plaintiff Brihmat and the New York Class)**

241.    Plaintiff Brihmat incorporates the preceding paragraphs 1-93; 131-147; 203-215 as alleged above.

242.    Danaher engages in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against applicants and prospective applicants ages 40 and older who applied for Covered Positions in New York. Danaher and Pall have intentionally discriminated against Plaintiff and the New York class in violation of the NYSHRL by, among other things:

a.    willfully utilizing a biased recruiting system for Covered Positions that excludes, and discriminates against workers ages 40 and over;

b.    unlawfully soliciting age-related information in the application process for purpose of screening and excluding older applicants;

c.    willfully implementing a discriminatory AI driven application process that screened out applicants ages 40 and over; and

50

d.   willfully using a common pre-interview recruiting and screening workflow to reject, screen out, or decline to advance qualified applicants age 40 and over before any first interview or individualized hiring-manager review.

243.   These company-wide policies are intended to and do have the effect of denying Plaintiff and the New York Class employment opportunities in New York because of their age. The discriminatory acts that constitute Danaher's and Pall's pattern and/or practice of discrimination have occurred both within and outside the liability period in this case.

244.   Age is not a bona fide occupational qualification for the Covered Positions.

245.   As a direct result of Danaher's discriminatory policies and/or practices as described above, Plaintiff and the New York Class have suffered damages including, but not limited to, lost past and future income, liquidated damages, punitive damages, compensation, and benefits.

246.   The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by the NYSHRL.

## ALLEGATIONS REGARDING INJUNCTIVE RELIEF

247.   Plaintiffs and the members of the putative classes and collective lack an adequate remedy at law to redress the ongoing harms described herein. Absent injunctive relief, they will continue to suffer irreparable injury from Danaher's discriminatory policies, practices, and procedures. An injunction is therefore necessary to prevent continuing violations and to restore equal employment opportunity.

248.   Defendants' actions have caused and continue to cause Plaintiffs and class and collective members substantial losses in employment opportunities, earnings, and other employment benefits.

249.   In addition, Plaintiffs and class and collective members suffered and continue to

51

suffer emotional distress, humiliation, embarrassment, and anguish, all to their damage in an amount according to proof.

250.    Defendants performed the acts herein alleged with intentional malice, willfulness, deceit, oppression, or fraud. Plaintiffs and class members are thus entitled to recover punitive damages in an amount according to proof.

251.    Each named Plaintiff remains willing and able to work, continues to seek employment in sales, account-management, business-development, sales-leadership, and strategic-account roles of the kind offered by Defendants, and intends to apply or reapply for such Covered Positions with Defendants.

252.    Each named Plaintiff remains subject to, and would again be subjected to, Defendants' centralized Workday, Talent Acquisition, DBS-governed, and AI-assisted screening system if he or she applies, and is deterred from applying because doing so would be futile so long as that discriminatory screening system remains in place. Plaintiffs therefore face an ongoing and imminent threat of future injury from Defendants' challenged practices, for which prospective declaratory and injunctive relief is necessary.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the class and collective pray for relief as follows:

(a) Certification of the case as a class action on behalf of the proposed Florida class;

(b) Designation of Plaintiff Cote as representative of the Florida class;

(c) Certification of the case as a class action on behalf of the proposed Louisiana class;

(d) Designation of Plaintiff Warren as representative of the Louisiana class;

(e) Certification of the case as a class action on behalf of the proposed California class;

(f) Designation of Plaintiff Bunenko as representative of the California class;

(g) Certification of the case as a class action on behalf of the proposed New York class;

(h) Designation of Plaintiff Brihmat as representative of the New York class;

(i) Certification of the action as a nation-wide collective action under the ADEA;

(j) Designation of Plaintiffs Warren, Cote, Bunenko, and Brihmat as representatives of the nation-wide collective action under the ADEA;

(k) Designation of Representative Plaintiffs' counsel of record as class and collective counsel;

(l)  A declaratory judgment that the practices complained of herein are unlawful and violate 29 U.S.C. §§ 621, *et seq*., the Florida Civil Rights Act, New York State Human Rights Law §§ 290-301("NYSHRL"), California Fair Employment and Housing Act, Gov. Code § 12940 *et seq.* ("FEHA") and the Louisiana Employment Discrimination Law, LA Rev Stat § 23:312 ("LEDL");

(m) A preliminary and permanent injunction against Defendants, its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns, and/or practices that discriminate against Plaintiffs and the classes and/or collective because of their age;

(n) An order that Defendants institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of age, and that it eradicate the effects of their past and present unlawful employment practices;

(o) An order appointing a monitor to ensure that Defendants comply with the injunction provisions of any decree that the Court orders;

(p) An order retaining jurisdiction over this action to ensure that Defendants comply with such a decree;

(q) An order for front pay benefits to Plaintiffs and class and collective Members;

(r) Back pay (including interest and benefits) for Plaintiffs and class and collective members;

(s) All damages sustained as a result of Defendants' conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof;

(t) Liquidated damages;

(u) Exemplary and punitive damages in an amount commensurate with Defendants' ability to pay and to deter future conduct;

(v) Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

(w) Pre-judgment and post-judgment interest, as provided by law; and

(x) Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and 29 U.S.C. §626(c)(2),

Plaintiffs demand a trial by jury in this action.

Dated: June 12, 2026.

Respectfully submitted by,
*/s/ George G. Triantis*
GEORGE G. TRIANTIS, ESQ.
D.C. Bar No.: 1671995
MORGAN & MORGAN, P.A.
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone: 813-577-4761
Facsimile: 813-559-4870
Gtriantis@forthepeople.com

Marc R. Edelman, Esq.
(*Admitted Pro Hac Vice*)
Florida Bar No.: 0096342
MORGAN & MORGAN, P.A.
201 N. Franklin Street, Suite 700
Tampa, Florida 33602
Telephone: 813-577-4722
Facsimile: 813-257-0572
medelman@forthepeople.com

Sophia L. Walker
(*Admitted Pro Hac Vice*)
Florida Bar No.: 1068754
MORGAN & MORGAN, P.A.
201 N. Franklin Street, Suite 700
Tampa, Florida 33602
Telephone: 813-424-5603
Facsimile: 813-329-6944
sophia.walker@forthepeople.com
*Attorneys for Plaintiffs*